WEBBER et al. v. POLICE JURY, PARISH OF VERMILION, LA., et al.

Civil Action No. 330.

District Court, W. D. Louisiana, Opelousas Division.

Jan. 6, 1943.

New Trial Denied Mar. 10, 1943.

Lewis & Lewis, of Opelousas, La., and Gordy & Gordy, of Abbeville, La., for plaintiffs.

L. P. Saal, of Gueydan, La., for defendants.

DAWKINS, District Judge.

Plaintiffs, residents of Michigan, sued the police jury for the Parish of Vermil- ion, the Board of Commissioners of the Gueydan Drainage District and certain individuals, alleging ownership of 3,053 acres of land situated in said parish, designated on the map attached to the bill of complaint as the "Florence Club"; that this property, with other lands, totalling 5,536.- 95 acres, had been included in Sub-District No. 1 of the said Gueydan Drainage District, and that certain portions thereof had been dedicated "for * * * canals, roads and levee purposes", and improved accordingly, by funds derived from the sale of bonds to be paid by taxes levied upon said property; that said sub-district was later dissolved and the property "particularly canals, streets and roads" became the property of the inhabitants of said district; that plaintiffs acquired their interest in said lands and improvements, subject to the use by other property owners in said sub-district of the servitudes of roads, canals, streets, etc.; and that no other persons have any right to use same; that among improvements so made was "a certain canal and levee * * * known as Canal and Levee No. 1 of said sub-district No. 1", which served to drain all lands in said sub-district; that the levee constructed on the east side of said Canal No. 1 was the main protection against flood waters from the lands to the east and southeast, and during low water, to retain a supply necessary and vital to the proper enjoyment of the property of plaintiffs.

Further, that at a cost of some $60,000 plaintiffs acquired the land and improvements, and also owned all the outstanding bonds originally issued to construct the canals and other improvements; that plaintiffs now maintain a private game preserve, at their own expense, in this and adjoining sub-district No. 2, and also carry on farming operations thereon, maintain tenant houses, etc., and the large two-story house known as the Florence Club; that the said levees, canals, roads, etc., are necessary to their operations.

Further, that there is another sub-district known as No. 5 immediately east of said sub-district No. 1, which voted its own taxes and made its own improvements but has no connection whatever with sub-district No. 1, nor are the property owners in said district No. 5 entitled to share or in any way utilize the improvements in sub-district No. 1.

Further, that on March 20, 1939, the Board of Commissioners of the Gueydan

Drainage District (of which No. 1 is a sub-district), in consideration of plaintiffs agreeing to cancel and surrender all outstanding bonds, passed a resolution for the liquidation of the said District No. 1 and authorized its president to quit claim and deed over to the landowners of sub-District No. 1 all the canals, levees, roads, rights of way and lands underlying the same, and in other property of the said sub-district; and that on said date, the said president carried out the said resolution "save and except that he failed to include within the conveyance one-half of the Canal No. 1 and the levee on the east side thereof", which plaintiffs contend "form and constitute part of the improvements of said sub-District No. 1 and should be deeded to the landowners" in said sub-district; that the said Board has refused to deed or recognize the title of plaintiffs and the other landowners in said sub-District No. 1 to the east one-half of the canal and the levee on its east bank thereof but has authorized others, who have no right or interest therein to take possession and use said canal and levee.

Further, that on April 3, 1939, the said Board by resolution undertook to grant to the police jury of the Parish of Vermilion a servitude or right of way along the canal or a part of the Levee No. 1, which grant was immediately accepted by the police jury, which immediately started construction of said road, in total disregard of plaintiffs' rights.

Further, that the defendants Bonin and Gooch own properties in said sub-District No. 5 to the east of said Canal and Levee No. 1, along its north end, and that defendant B. E. Sirmon also owns lands in sub-District No. 5 east of the south end of the said canal and levee; that each and all of these defendants, through their agents and employees, have cut the levee and permitted excessive waters to flow on the property of plaintiffs, and they have also erected pumps to pump the waters from the east on to the lands of the plaintiffs in high water, but that in low water, they drain the water from the canal for the use of their property by cutting the levee and deprive the plaintiffs thereof.

Plaintiffs prayed for a preliminary injunction, finally that it be made permanent and for judgment recognizing them as "owners in full legal title to the east half of said Canal and Levee No. 1."

In the alternative plaintiffs prayed that in event the full legal title to the said portions of said canal and the levee be not recognized in plaintiffs, they, together with all other property owners in said sub-District, be decreed the owners in indivision of the whole said Canal No. 1 with exclusive right to use, supervise and control the same, and to enjoy to the exclusion of all others the privileges and benefits to be derived therefrom, and finally for a mandatory injunction, commanding the defendants "to immediately repair the cuts made in said levee."

The application for the preliminary injunction was heard and granted without opposition on the 18th of September, 1940. All the defendants filed joint answers, admitting some of the allegations, but denying others, the principal points of denial being that the Canal No. 1, although it served sub-District No. 1, "has been incorporated into the general drainage system" and the levee on its east side gives no protection to plaintiffs' alleged property, because waters from the east "drain naturally into Canal No. 1"; that the levee was broken by natural causes about 1923, and can not serve to retain waters for the reason it is open at the south and connects with a large drainage ditch which flows through other lands, to the Intercoastal Canal; and that the principal purpose of plaintiffs was to establish a private hunting and fishing club. They denied that the lands east of the Canal No. 1 belonged in sub drainage District No. 5 but were a part of the original "parent Gueydan Drainage District" and that defendants as the owners of the property in sub-District No. 5 are entitled to utilize all drainage and protection systems in each district.

Further, that the quit claim deed of the president of the Board of Commissioners of the Gueydan Drainage District, in accord with the intent and purposes of the resolution by it, declined to include the eastern half of the canal and the levee on the east bank thereof; they denied that they pumped any water on the lands of plaintiff, but because of the fact that defendants' lands are situated in the parent Gueydan Drainage District and the natural drainage of their lands in a southwesterly direction, they are entitled to have the benefit of the said Canal No. 1; that conditions along the said canal have not changed materially since 1923 except during the

flood of 1940 when waters from the south backed up in the canal and onto all property in that area.

Further, that on May 19, 1932, the plaintiffs herein and all other property owners of said sub-District No. 1, along with respondent Board of Commissioners, declared that Canal No. 1 was part of the general drainage system and accordingly by contract it was deepened and widened along the ditch connecting it with the Intercoastal Canal, to give better drainage to all the lands on either side of said canal.

Further, that prior to the construction of Canal No. 1 and the levee on its east bank the defendants Bonin, Gooch and the Gilmore estate owned lands which drained naturally to the west and across those now belonging to plaintiffs, through an old river or bayou bed which ran through the Bonin and Gooch lands and across the land of plaintiffs, which was filled in where it is crossed by Levee No. 1 and Canal No. 1, but that sub-District No. 1 "was abandoned" as a levee and pumping project in about 1922; that the dam in the south end of Canal No. 1 was cut and the water allowed to flow in its natural direction south.

Reverting back to the origin of the drainage system in that locality, defendants allege that on May 10, 1911, the Orange-Cameron Land Co., which then owned all the lands now belonging to the Gilmore Estate, conveyed to the Gueydan Drainage District and the police jury of Vermilion Parish "to be used for canals for drainage and road purposes forever" said lands; and that on December 6, 1911, the Whitelake Land Co. made a similar transfer to the said drainage district of other lands for the same purpose; and that since the said canal "is a permanent work", as riparian proprietors, defendants are entitled to draw waters therefrom and to have the use and benefit thereof for their bordering lands.

Defendant, Gueydan Drainage District, averred that it had acted in accordance with the authority conferred upon it by law "to the best interests of all landowners" and that the Orange-Cameron Land Co. and the Whitelake Land Co. had dedicated irrevocably to public use the lands in question and which had been accepted by the said Board and Police Jury of Vermilion Parish.

The prayer of this joint answer was that the suit be dismissed at the cost of plaintiffs.

The evidence was taken and the record made up by agreement out of court. This included a stipulation of facts, which are accepted and found accordingly, the substance of which is as follows:

The value of the rights involved exceed the sum of $3,000, minimum jurisdiction for this court; plaintiffs are the owners of lands shaded on the copy of map of the U. S. geological survey, marked P-1 (except the east half of Canal No. 1 and Levee No. 1 abutting the same on the east, which are presently in controversy), which were acquired by the plaintiffs in 1930.

Further, sub-Drainage District No. 1 was legally created; Canal No. 1 and Levee No. 1 were constructed, along with others, from the proceeds of the bond issue of $172,000 secured by taxes to be levied upon the property within said sub-Drainage District No. 1, as shown on exhibit 2; taxes were levied for a few years to pay said bonds, but due to failure to collect them, the bonds were defaulted, and the plaintiffs, having acquired said property shown on the map P-1, bought up all the outstanding bonds "for a valuable consideration", and thereafter used them in having the said sub-district liquidated and the bonds cancelled; prior to liquidation, the Board of Commissioners of the Gueydan Drainage District, at the instance of plaintiffs and other property owners affected thereby, adopted a resolution marked P-3 attached to the stipulations, which, among other things, recited the following:

"With respect to Canal No. 1 or Navigation Canal, the Board considers that there is some doubt as to whether or not this canal may be properly considered as a private canal for the exclusive benefit of the property owners of sub-district No. 1 and whether or not land owners to the east thereof and outside of sub-district No. 1 have rights to drain into and to take water from said No. 1 canal. In view of the uncertainty as to the legal status of said canal and in view of the doubt existing in the minds of the Board as to their authority in the matter, the Board concludes that it can not at this time deed the entire canal to land owners on the west bank of the canal, but that it is willing to deed said canal to the center thereof, leaving for final adjustment as to the east half to be determined by the proper court.

"Attention of the Board is called to the fact that unrestricted flow of water into

No. 1 canal from lands to the east and outside of sub-district No. 1, has in the past and will in the future greatly interfere with proper drainage of lands in sub-district No. 1. Also it is called to the attention of the Board, that if No. 1 canal is not definitely considered as private to the owners in sub-district No. 1 that there is danger that this canal may become connected with the Gueydan outfall canals and thereby overtaxing the capacity of said canal and destroying its usefulness and for drainage purposes to property owners in sub-district No. 1.

"The Drainage Board feels that pending some legal determination of the status of No. 1 canal, the land owners adjoining same are entitled to protection and the Board is willing to declare that not now nor at any time in the future shall No. 1 canal become connected with the Gueydan outfall drainage canals.

"In view of the contention of the Tenants of land owners on the east side of said No. 1 canal, that they have the right to drain into and to take water from said canal but that pending legal determination as to the status of said canal, they are willing that the Board set a limit as to the amount of land which shall drain into and take water from said canal. They propose that this limit be set at 600 acres in any one year. They further propose and agree to construct and to maintain in good repair protection levees surrounding said area of 600 acres and to prevent the flow of water into said canal from any other land. The Board will approve such an arrangement if satisfactory to the owners in sub-district No. 1 and agrees that in case of failure of such protection levee it will at once upon complaint of parties interested, close all openings in No. 1 levee until such time as proper repairs are made to the protection levee. All such expense to be for account of tenants of land owners on the east side of No. 1 canal, which expense such tenants have agreed to pay.

"If the proposed tentative agreement is acceptable to the parties interested, the Board will be glad to proceed with the cancellation of Dist. No. 1 bonds and simultaneously to transfer by quit claim all of the property as indicated and also to liquidate said sub-district No. 1.

"With further reference to No. 1 canal it is agreed that the east levee thereof shall not be used as a public roadway but its use shall be restricted to persons farming the adjoining lands. It is further agreed that with reference to the use of No. 1 canal by boats, such use shall be restricted to those who own property in said sub-district No. 1 and those who are granted permits by the Florence Club and by A. L. Arpin, such arrangement to hold pending legal determination of the status of said canal. It is recognized by the Board that this canal has for the past 25 years been maintained by District No. 1 and for the past several years by the Florence Club and A. L. Arpin.

"This Board takes occasion to express its desire to cooperate in the development of the agricultural possibilities of the land in said sub-district No. 1 and No. 2 and the prosperity of the property owners. It desires to cooperate and to assure full protection and all legal and reasonable demands looking to the full enjoyment by the Florence Club, of its property."

This resolution was passed February 25, 1938.

It was further stipulated that the Board of Commissioners of the Gueydan Drainage District, thereafter, on February 25, 1938, "quit claimed" the property described therein to the land owners of said sub-District No. 1, as set forth in P-4. This exhibit is a resolution of the Board of Commissioners of the Gueydan Levee District, which quotes in full the petition of the property owners in sub-District No. 1 for its dissolution and liquidation in consideration for the surrender and cancellation of the bond issue of $172,000, and authorizes the quit claiming of all the canals, levees, roads, rights of way and the land underlying the same, pumping plant sites and other property to the owners in said sub-District No. 1. This petition listed the names of land owners and the acreage owned by each. As to all the interior canals, the conveyance was to the riparian owners on either side to the middle of the canals, but as to the one on the western boundary, it was to extend "to the extreme western boundary of the levee, canal and right of way * * *", while, as to the canal and levee on the east the following language was used: "(d) As to all land owners fronting or abutting on the canal, levee and right of way on the extreme eastern boundary of said sub-Drainage District No. 1, which canal is known as canal No. 1, the quit claim shall be granted to owners on the

west side of said canal, conveying to the center of said canal."

The resolution concluded by authorizing the president of the Board of Commissioners of the Gueydan Drainage District to quit claim to the land owners of said Sub-Drainage District No. 1 "* * * canals, levees, roads, rights of way, and the lands underlying the same, pumping plant sites and other property of said Drainage District No. 1 in accordance with the aforesaid petition of said land owners * * *, and to execute all acts necessary therefore". This exhibit does not include the actual deed to the property, nor have I been able to find such a document in the record.

It is further stipulated that Levee No. 1 (which is in dispute) is about three miles long and at times has been cut "by persons other than the ·inhabitants and landowners in Sub-District No. 1 * * * at eight different points" as indicated upon exhibit P–2; defendants Gooch and Bonin did not own any lands in fee simple adjoining on the east side of Levee and Canal No. 1. It is further stipulated that by resolution passed in May, 1932, the Board of Commissioners of the Gueydan Drainage District gave "the navigation rights on said canal # 1" to the Florence Land Co., as indicated by exhibits D–1 and D–A–1, and that thereafter on January 14, 1933, the said Board made a supplemental agreement with said land company as evidenced by exhibit 2. D–1 and D–A–1 are (1) a letter by I. M. Goldberg to G. E. West, manager of the Florence Club, and (2) an agreement between the Board of Commissioners of the Gueydan Drainage District and the Florence Land Co., Inc., respectively, the first dated January 1, 1940, and the second dated May 19, 1932. D–1 seems to have no importance at this point but in D–A1 the Gueydan Drainage District declared that it would "subject to general approval of the land owners of said Sub-District No. 1 and upon completion of the work herein stipulated to be performed in the interest of the property owners * * * transfer to the Florence Land Co. said Canal No. 1, it being understood that such transfer is for transportation purposes, and that the oil and mineral rights belonging to this right-of-way is (are) reserved to the said Sub-Drainage District No. 1". The Florence Land Co. was to provide protection and control of the water level for some 2,660 acres of land by the construction of a dam and levee at certain specified locations, do certain excavation work, and provide connection with the Intercoastal Canal. The land owners of Sub-Drainage District No. 1 were to continue to have use of the canal, but "pleasure boats" were to be restricted by the rules "which now apply to enable the Florence Club to protect itself against poachers, etc." It was further agreed that the work to be done by the Florence Land Co. was to be performed within one year, "and that the completion of the work would automatically effect the transfer to the Florence Land Co. or to its assigns" of all the rights enumerated.

Deeds from the Orange-Cameron Land Co. and Whitelake Land Co., dated May, 1911, and December, 1911, were admitted and identified as D–3 and D–4 respectively.

Further, the owners of land in Drainage District No. 5, east of Canal and Levee No. 1, paid drainage taxes upon their lands from 1902 to 1930, to the Gueydan Drainage District, which was separate and apart from those in Sub-District No. 1.

Further, the police jury of said parish, just prior to the filing of this suit, passed a resolution calling for the construction of a public road upon and along said Levee No. 1, without previously having expropriated said land, actually levelled the top of said levee and threw it open to the public, but was stopped by the injunction granted by this court.

In lieu of their personal appearance as witnesses, it was agreed that if Val E. Smith, Civil Engineer, was called, he would testify to facts substantially as set forth in the three letters P–6, P–7, and P–8, in connection with the maps P–8a, P–8b and P–8c; that if R. I. Tanner, Civil Engineer, were present, he would testify substantially in accordance with the facts set forth in the letter marked P–9; and that if R. W. Crawford, lieutenant colonel, U. S. Engineers, were present he would testify substantially in accordance with the facts in letter marked P–10. These admissions were subject to the right to rebut the statements in these documents. It was further stipulated that D–5 (which is a copy of the petition of property owners for the dissolution and liquidation of said Drainage District No. 1) was executed and filed and the contents were substantially as above summarized.

Further, that Whitelake Land Co. originally owned "all the property comprising Sub-District No. 1, as evidenced by P-2" and that it "legally deeded and dedicated that said property to the Sub-District and particularly the canals and levees and roadways shown on said plat, P-2". This resolution reserved to the landowners in Sub-District No. 1 the right to contest, in accordance with their claims, the title to Canal and Levee No. 1.

The evidence otherwise tends to show that while originally Sub-Drainage District No. 1 was a definite reclamation project, to drain by canals and to protect by levees a definite area of some 5,000 acres of land, in order that the same might be cultivated as farm property, the major portion of that undertaking was abandoned in the early twenties; that in 1930 plaintiffs bought more than one-half of these lands and built a hunting lodge or club thereon, known as the Florence Club; that subsequently, the idea was conceived of enlarging and deepening Canal No. 1 on the east side of said district so that it might be used for navigation. This undertaking also was only partially successful and was later abandoned. In the meantime, Levee No. 1 was allowed to deteriorate, some of it washed away from natural causes and other parts were cut, at some eight points in all, and for more than 10 years waters from lands on the east have drained through these cuts or breaks into Canal No. 1; at other times, during that period, landowners on the east have pumped excess waters into this canal and have taken it therefrom for their farming purposes.

There was never any levee on the west side of Canal No. 1 but the property in the Sub-District No. 1, originally, was drained by other smaller canals running north and south and east and west within the district itself, those on the north, east, south and west apparently being larger than the internal drainage canals. A pumping station was constructed in the southwest corner and in times of high water the excess was pumped over the levees, but as stated, this was abandoned after only a few years, in the early twenties. Levee No. 1 on the east bank of Canal No. 1 could not serve to protect the lands in Sub-District No. 1 from waters in the canal, although it did prevent the excess in high water periods from flowing into Canal No. 1 from the east. The evidence also preponderates to

the effect that, even with the openings in the Levee No. 1, as they were made over the years, the canal was capable of draining the water off without adding any appreciable burden to plaintiffs' lands, except when storms from the south or other conditions caused it to flow or back up in a northerly direction from the marshes into Canal No. 1. When this happened, as in 1940, that whole section of the parish was submerged.

Controversies have gone on for some time between the plaintiffs on the one part, and Messrs. Bonin, Gooch and Sirmon on the other, with respect to openings in Levee No. 1, the pumping of water into Canal No. 1 from the east, and the use of waters from the latter in low stages. This culminated when the Police Jury of the Parish, sometime before the filing of this suit, passed a resolution authorizing the construction of a public road upon and along Levee No. 1.

 When the lands, upon which Canal No. 1 and Levee No. 1 were built, were donated to the Gueydan Drainage District and the Police Jury of Cameron Parish by the Orange-Cameron Land Co. and the Whitelake Land Co., it was declared that the same was done for the benefit of the public, to be used in construction of canals, levees, roads, highways, etc. Sub-Drainage District No. 1, after its creation years later, actually dug this canal and constructed the levee upon its east bank with the proceeds from the sale of bonds, which were issued for that purpose and to be paid in taxation upon lands within the district, and of course, to that extent, these improvements were for the use and benefit of the property owners within said Sub-District. It is perfectly obvious that the only possible purpose of the levee on the east bank of Canal No. 1 was to keep waters east of it from flowing west into the canal and upon lands in Sub-District No. 1, but this was in connection with the general plan and scheme as a whole, of reclaiming, protecting and cultivating the lands within said Sub-District. However, when the undertaking was abandoned, and the entity known as Sub-Drainage District No. 1 went out of existence and was liquidated, the bonds were purchased by the plaintiffs and surrendered for cancellation, the effect was to leave the ownership of lands within the district as they stood at that time; the lien and claims of

the former holders, with the auxiliary remedies for the assessment and collection of taxes to pay them, ceased, leaving to the plaintiffs whatever rights, if any, they might have against other owners of land within the district for reimbursement of their parts of these obligations. It is true that the Board of Commissioners of the parent, Gueydan Drainage District, authorized its president to convey by quit claim deed all rights in and to canals, levees, roadways, pumping sites, etc. within the district, but it specially limited this to one-half of Canal No. 1 and excluded Levee No. 1 on its east bank. There is serious question as to whether, in view of the declared nature and purpose of the donations by the Orange-Cameron Land Co. and the White Lake Land Co., the Gueydan Drainage District and the Police Jury of Cameron Parish could convey, in fee simple, title to Levee No. 1 and Canal No. 1, to individuals owning lands within Sub-District No. 1 alone. That donation was long before the creation of said district, and inasmuch as the strips of land so given were parts of properties on the east side of the Levee and Canal No. 1, as subsequently constructed, it can not be said without question, that use of lands so donated were for the exclusive benefit of persons on the west any more than on the east. Be that as it may, limitations and exclusions in the authorized conveyance to plaintiffs as to this levee and canal are such that they can not be said to be the legal record owners thereof. Plaintiffs must stand or fall upon the strength of their own title, and having none, either by conveyance or prescription as to the east half of the Canal and Levee No. 1, their demand to be declared the owners thereof must fail.

The alternative demand to be recognized as possessing the right of exclusive use or servitude stands on no better footing. As previously stated, the organization or entity, through which the system was to operate, no longer exists, the plaintiffs own only a portion of the land in the district and many of the principal features of the reclamation program have been abandoned while others have disappeared. These conditions make it impossible for the scheme to function, to say nothing of such rights as property owners east of the Levee and Canal No. 1 have acquired by limitation or usage over a long period of years.

It would seem from all this, that the authority and control over the east half of Canal No. 1 and Levee No. 1, as well as drainage generally throughout that section, remain with the parent Gueydan Drainage District, out of which District No. 1 was carved but later abandoned and liquidated; that the Board of Commissioners of this district should regulate the matter of openings in Levee No. 1 and drainage into Canal No. 1, in such manner as to provide fair and just treatment of all the owners on either side thereof; and that finally, the police jury as the governing authority of the parish with respect to roads, etc, can and should exercise its powers in a proper and equitable way for the benefit of the citizens of the whole parish.

Plaintiffs' suit should be dismissed at their cost. Proper decree may be presented.

**On Motion for New Trial.**

After due consideration of the matter for a new trial in the above case I am of the view that the same should be and it is accordingly overruled. Proper decree should be presented.